People v Lancaster (2021 NY Slip Op 07039)





People v Lancaster


2021 NY Slip Op 07039


Decided on December 16, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 16, 2021

112628
[*1]The People of the State of New York, Respondent,
v
Johnnie Lancaster, Appellant.

Calendar Date:October 22, 2021

Before:Garry, P.J., Lynch, Clark, Pritzker and Colangelo, JJ.

Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
David J. Clegg, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), entered May 1, 2019, upon a verdict convicting defendant of the crimes of burglary in the first degree and criminal possession of a weapon in the third degree.
Defendant was charged by indictment with burglary in the first degree and criminal possession of a weapon in the third degree in connection with a February 2018 home invasion in the Town of Saugerties, Ulster County. Defendant was convicted as charged following a jury trial, at which he represented himself. He was sentenced to a prison term of 20 years, to be followed by five years of postrelease supervision, upon the burglary conviction and a lesser concurrent prison term on the weapon possession conviction, as well as $1,100 in restitution. Defendant appeals.
Defendant contends that County Court jeopardized his right to a fair trial when it made certain statements to the jury pool that, in his view, created the potential for prejudice. As defendant did not object to the challenged statements, this argument is unpreserved (see CPL 470.05 [2]; People v Santiago, 185 AD3d 1151, 1152 [2020], lv denied 35 NY3d 1097 [2020]). In any event, the remark by County Court that the jury had the opportunity to "assist the court" came at the conclusion of introductory remarks in which the court explained the role of the jury (to determinate facts) and the court (to state the law) to ensure that defendant received a fair trial. The court was explaining that it was for the jury to determine whether the People proved defendant's guilt beyond a reasonable doubt. Although the court's comment was inartful and of some concern, in context, we do not find defendant's right to a fair trial to have been compromised.
With respect to the burglary conviction, defendant contends that the verdict is against the weight of the evidence as it relates to the dwelling and intent elements of the crime. He first argues that, even if he entered into a screened-in porch area of the residence, the porch does not qualify as a "dwelling" within the embrace of the Penal Law. He further posits that any entry into the porch was not to commit a crime but for the innocuous purpose of retrieving an errantly fired crossbow arrow.
In conducting a weight of the evidence review, this Court must "first determine whether, based on all the credible evidence, a different finding would not have been unreasonable" (People v Stover, 178 AD3d 1138, 1139 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1163 [2020]; see People v Butkiewics, 175 AD3d 792, 793 [2019], lv denied 34 NY3d 1076 [2019]). "Where a different finding would not have been unreasonable, this Court must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Forney, 183 AD3d 1113, 1114 [2020[*2]] [internal quotation marks and citations omitted], lv denied 35 NY3d 1065 [2020]; see People v McMilan, 185 AD3d 1208, 1208 [2020], lvs denied 35 NY3d 1112, 1114 [2020]).
As charged in the indictment, "[a] person is guilty of burglary in the first degree when he [or she] knowingly enters or remains unlawfully in a dwelling with the intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he [or she] or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument" (Penal Law § 140.30 [3]). A dwelling "means a building which is usually occupied by a person lodging therein at night" (Penal Law § 140.00 [3]), and a dangerous instrument means, in pertinent part, "any instrument
. . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious injury" (Penal Law § 10.00 [13]). In determining whether an instrument is dangerous within the meaning of the statute, "[t]he courts of this [s]tate have consistently adopted [a] use-oriented approach," which focuses on whether the instrument was "used in a manner which render[e]d it readily capable of causing serious physical injury [or death]" (People v Carter, 53 NY2d 113, 116 [1981]).
At trial, the victim testified that, at the time of the incident, he was at home with his wife and three young children. The residence consisted of two stories and a basement, with all of the bedrooms located on the second floor. The family room was located on the first floor and was connected to a screened-in porch, which contained tile flooring, electricity, two couches and a dining table. The victim and his family used the porch for "everyday activities" and ate their meals there on a regular basis. As to the underlying incident, the victim testified that, around 1:30 a.m. on February 23, 2018, he awoke to the sound of his three-year-old son crying, prompting him to get out of bed, console the child and go back to sleep. When he awoke again at 7:35 a.m., he went downstairs and noticed that the blinds were cracked in the family room. The victim pulled the blinds back and noticed "a hole in the window" between the family room and the porch. The victim went onto the porch and he observed that "the couches were tossed [and] all the pillows were off the couches." He also noticed that the room's two screened doors had been tampered with, explaining that there was a rip in one of them and the other was "completely ripped" off of its frame. Moreover, "[t]he banister going down the steps was missing the end cap on the stair rail" and the basement window was "completely removed with glass on the exterior of the home." The victim also found an "arrow" lodged in the wall above the family room couch "at head level." The victim then informed his wife about the discovery, had the family gather in the bathroom while he performed [*3]a "security sweep"[FN1] of the house and eventually called the police. The victim confirmed that he had not given anyone permission to enter the home and had locked the doors before going to bed.
As to the physical evidence, Vincent M. Boyd, a forensic investigator with the State Police, responded to the residence around 10:35 a.m. for the purpose of collecting DNA samples. Boyd located blood on the frame of the exterior door to the screened-in porch and a vertical rip in the screen of the door. Moreover, he located two "cut marks" in the screen of the same interior window where the arrow had passed through — between the porch and family room — as well as blood on the screen and a bent window frame. According to Boyd, it "appeared as though the window itself had been pried in an attempt to remove it." He also noticed a round hole in this window, positing that the hole was created by the arrow having been shot through it, which, in his estimation, had travelled "15 feet across the room" and "embedded itself into th[e] [living room] wall" 51 inches off of the ground. Boyd also found an axe under the steps to the entrance of the porch, which had blood stains on it. Although no fingerprint evidence was found on the axe, defendant's DNA was located on it, as well as in the blood on the exterior door frame to the porch. Brian Lasowski, an investigator who responded to the residence after the incident, examined the basement and noted that the basement window had been broken. He observed broken glass and what appeared to be blood on tiles that had fallen from the basement ceiling, which also contained defendant's DNA.
Jan Anthony, a police investigator, explained that he responded to a residence nearby the victim's home on the evening of February 28, 2018 after a crossbow had been located in a wooded area between the driveway and the road. The crossbow was "loaded and cocked" when Anthony arrived and a backpack was also located in the area, which contained packaging for a telephone SIM card, as well as a towel, a couple of packages of crossbow bolts and a container that had yellow liquid in it. Police obtained a subpoena for the subscriber information associated with the SIM card, confirming that defendant's name was listed as an authorized user on the account. Defendant's DNA was also found in blood that was located on the trigger guard area of the crossbow. Finally, the People presented evidence that the type of crossbow at issue was designed for hunting large game, 150 pounds of pressure would need to be exerted on the string to fire it and the arrow would leave the crossbow at a speed of approximately 215 feet per second.
Defendant's contention that the screened-in porch was not part of the dwelling for purposes of a burglary conviction implicates a legal question that is more appropriately raised in the context of a legal sufficiency argument (see People v Rivera, 301 AD2d 787, 788 [2003], lv denied 99 NY2d 631 [2003]). As defendant did [*4]not move to dismiss the indictment on this ground following the close of the People's proof, this argument is unpreserved (see id.). In any event, it plainly lacks merit, as this Court has previously recognized that a screened-in porch is part of the dwelling to which it is attached for purposes of a burglary conviction and the testimony in this case makes clear that the victim and his family used the area for residential purposes (see id.; see also People v McCrea [Berry], 194 AD2d 742, 743 [1993], lvs denied 82 NY2d 751, 756 [1993]; People v Lewoc, 101 AD2d 927, 928 [1984]). Given that defendant's blood was located in this area and the victim testified that he had not authorized anyone to enter on the evening in question, the People proved beyond a reasonable doubt that defendant unlawfully entered a dwelling without permission.
For purposes of burglary, the proof of unlawful entry into a dwelling is separate and distinct from the element of acting with a contemporaneous intent to commit a crime inside. The further question is whether the People established defendant's intent to commit a crime at the time of entry (see People v Gaines, 74 NY2d 358, 363 [1989]). The People maintain that defendant entered the porch with the intent to shoot the arrow from that location into the family room and that he did, in fact, do so. There was ample evidence that the crossbow was "used" in a manner that was readily capable of causing death or serious physical injury insofar as it was fired at head level into a residential living area while the victim and his family were at home. The photographic and testimonial evidence demonstrated that a crossbow arrow passed through the interior window between the porch and family room. As to whether the shot was taken from inside the porch area itself, we recognize that there was no direct testimony to that effect. The record does, however, include an exterior photograph of the porch. Upon examining this photograph, we conclude that a jury could rationally conclude that there were no holes in the screens facing out from the back of the house — a conclusion that would necessarily mean that defendant fired the shot from inside the porch. We are mindful that the record includes a close-up photograph depicting the exterior door to the porch that reveals a tear in the screen, but there is no proof that this door lines up with the damaged interior window, and the photographs in evidence suggest otherwise. Given the above, we conclude that the burglary conviction is supported by the weight of the evidence.
Defendant further contends that the 20-year sentence for the burglary conviction was harsh and excessive. Burglary in the first degree is a class B violent felony (see Penal Law § 140.30), punishable by a determinate prison term between 5 and 25 years (see Penal Law § 70.02 [3] [a]). Thus, the sentence was within the permissible sentencing range. That said, we are troubled by comments that the trial judge made [*5]about his own personal "experience being the victim of a burglary" on two occasions. While the judge quickly added that he would not let that personal experience interfere with his judicial obligations, his ensuing remarks include vindictive commentary revealing that he over-personalized this case. A court's actual role in determining an appropriate sentence is "'to weigh and consider societal protection, rehabilitation and deterrence, as well as the circumstances that gave rise to the conviction'" (People v Johnson, 197 AD3d 61, 72 [2021], quoting People v Lanfair, 18 AD3d 1032, 1034 [2005], lv denied 5 NY3d 790 [2005]). Although we agree with County Court that defendant's underlying actions were extremely dangerous and warrant a significant prison term, under the circumstances, we have determined to reduce the prison term on the burglary conviction, in the interest of justice, to 12 years.
Garry, P.J., Clark, Pritzker and Colangelo, JJ., concur.
ORDERED that the judgment is modified, as a matter of discretion in the interest of justice, by vacating the sentence imposed on defendant's conviction of burglary in the first degree under count 1 of the indictment; defendant is sentenced to a prison term of 12 years on said conviction; and, as so modified, affirmed.



Footnotes

Footnote 1: At the time of the incident, the victim was a federal agent.