People v Rivera (2022 NY Slip Op 04050)

People v Rivera

2022 NY Slip Op 04050

Decided on June 23, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 23, 2022

111033
[*1]The People of the State of New York, Respondent,
v
Storm N. Rivera, Appellant.

Calendar Date:April 20, 2022

Before:Aarons, J.P., Pritzker, Reynolds Fitzgerald, Ceresia and Fisher, JJ.

Rural Law Center of New York, Castleton (Kelly L. Egan of counsel), for appellant, and appellant pro se.
Gary M. Pasqua, District Attorney, Canton (Matthew L. Peabody of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of St. Lawrence County (Catena, J.), rendered April 5, 2019, upon a verdict convicting defendant of the crimes of rape in the first degree and unlawful imprisonment in the second degree.
In April 2018, defendant was charged by indictment with rape in the first degree and unlawful imprisonment in the second degree in connection with the alleged rape of the victim at a party at defendant's college fraternity in November 2017. After a jury trial, defendant was convicted as charged. Following an unsuccessful CPL 330.30 motion to set aside the verdict based on ineffective assistance of counsel, defendant was sentenced to a prison term of eight years to be followed by 10 years of postrelease supervision for his conviction of rape in the first degree and to a lesser concurrent jail term for his conviction of unlawful imprisonment in the second degree. Defendant appeals.
Defendant first contends that the verdict as to his conviction for rape in the first degree is against the weight of the evidence. As relevant here, a "person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . by forcible compulsion" (Penal Law § 130.35 [1]). "Within the context of sex offenses, forcible compulsion means to compel by either use of physical force; or a threat, express or implied, which places [the victim] in fear of immediate death or physical injury" (People v Garrand, 189 AD3d 1763, 1764 [2020] [internal quotation marks and citations omitted], lv denied 36 NY3d 1120 [2021]; see Penal Law § 130.00 [8]).
Here, the victim testified that defendant pushed her down over a couch, held her down while she repeatedly tried to get up and, despite telling defendant in various ways that she did not consent, he engaged in sexual intercourse with her.[FN1] Although there were no other witnesses who observed the actual incident, the People put in forensic testimony which established that defendant's DNA profile matched that of DNA found in the victim's underwear. The People also called an expert witness who testified about trauma responses in sexual assault victims. Defendant, in both his oral and written statements to police prior to his arrest and his testimony at trial,[FN2] asserted that the sexual intercourse was not by forcible compulsion but, rather, was consensual. "While there were certainly differences between the victim's and defendant's versions of events, their conflicting testimony 'presented a classic he-said-she-said credibility determination for the jury to resolve'" (People v Horton, 162 AD3d 1118, 1120 [2018], quoting People v Kiah, 156 AD3d 1054, 1056 [2017], lvs denied 31 NY3d 981, 984 [2018]). Although defendant raises multiple assertions as to why the victim's testimony is incredible as a matter of law, we do not find anything in the record to support such contentions (see People v Alexander, 160 AD3d 1121, 1123 [2018], lv denied 31 NY3d 1144 [2018]; 
People [*2]v Bautista, 147 AD3d 1214, 1216 [2017]). "Viewing the evidence in a neutral light and according deference to the jury's credibility assessments, the verdict is supported by the weight of the evidence as to all of the charged crimes" (People v Brabham, 126 AD3d 1040, 1043 [2015] [citations omitted], lvs denied 25 NY3d 1160, 1171 [2015]; accord People v Horton, 162 AD3d at 1120).[FN3]
Defendant next asserts that County Court erred in denying his motion to suppress statements made to the police because his right to counsel had attached regardless of whether he was in police custody or not. As relevant here, "[i]t is well settled that a defendant's indelible right to counsel attaches in two situations; the first being upon the commencement of formal proceedings, whether or not the defendant has actually retained or requested a lawyer, and the second when an uncharged individual has actually retained a lawyer in the matter at issue or, while in custody, has requested a lawyer in that matter" (People v Slocum, 133 AD3d 972, 974 [2015] [internal quotation marks and citations omitted], appeal dismissed 29 NY3d 954 [2017]; see People v Spahalski, 151 AD3d 1716, 1717 [2017], lv denied 30 NY3d 953 [2017]).
A review of the suppression hearing testimony and a video recording, which was admitted into evidence at the hearing, reflect that defendant first went to the Potsdam Police Department and spoke with an investigator in December 2017 but, after the investigator read defendant his Miranda rights, defendant stated that he had spoken with an attorney and did not wish to provide a statement at that time. The interview terminated at that point. Defendant later requested to speak with the investigator and returned to the police department to do so in February 2018. The investigator clarified that defendant previously stated he had an attorney, but that that person ended up not being defendant's attorney and that defendant tried to find an attorney on his own. Defendant appears to have stated that he could not afford an attorney. The investigator then clarified that defendant was there on his own accord and was free to leave at any time. The interview ensued and defendant, who was not restrained in any way, did not at any point request an attorney. At the conclusion of the interview defendant freely left the police station. Given the foregoing, defendant, who had not been charged, was clearly not in custody given that he was not restrained in any way and was repeatedly told that he was free to leave at any point, which he in fact did at the conclusion of the interview (see People v Lyons, 200 AD3d 1222, 1223-1224 [2021], lv denied 37 NY3d 1162 [2022]; People v Pagan, 97 AD3d 963, 966-967 [2012], lv denied 20 NY3d 934 [2012]). Although defendant argues that his right to counsel did attach because he informed the investigator that he had an attorney in December 2017 and defendant spoke to this attorney, defendant is incorrect. Given the revelation in the [*3]February 2018 interview that defendant did not actually retain an attorney in December 2017, defendant's right to counsel did not attach (see People v Spahalski, 151 AD3d at 1716-1717; compare People v Slocum, 133 AD3d at 977-978). Accordingly, County Court properly denied defendant's motion to suppress the statements made at this interview.
We are also not persuaded that defendant was deprived of his right to a fair trial due to prosecutorial misconduct. Specifically, defendant takes issue with the prosecutor referring to the victim as a "victim" and a "survivor," asking leading questions of the victim and expressing his personal opinion of the credibility of witnesses. We note that the prosecutor only referred to the victim as a "victim" and a "survivor" twice and, although the prosecutor asked multiple leading questions, County Court took appropriate corrective action in sustaining objections to these questions. Moreover, although it was improper for the prosecutor to express his personal opinion of the credibility of witnesses, County Court gave an appropriate curative instruction after defendant objected and, while charging the jury, again instructed that the comment was improper and was to be disregarded (see People v Johnson, 183 AD3d 77, 90 [2020], lv denied 35 NY3d 993 [2020]; People v Devictor-Lopez, 155 AD3d 1434, 1437 [2017]). Accordingly, reversal is not required given that "our review of the record as a whole 'fails to disclose that the prosecutor engaged in a flagrant and pervasive pattern of prosecutorial misconduct so as to deprive defendant of a fair trial'" (People v Burns, 188 AD3d 1438, 1442 [2020], lvs denied 36 NY3d 1055, 1060 [2021], quoting People v Shamsuddin, 167 AD3d 1334, 1336 [2018], lv denied 33 NY3d 953 [2019]).
Defendant also contends that he was not provided the effective assistance of counsel. "To establish a claim of ineffective assistance of counsel, a defendant is required to demonstrate that he or she was not provided meaningful representation and that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Santana, 179 AD3d 1299, 1302 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 973 [2020]; see People v Sanchez, 196 AD3d 1010, 1013-1014 [2021], lv denied 37 NY3d 1029 [2021]). Defendant argues that counsel did not provide meaningful representation in that he failed, among other things, to pursue a possible Rosario violation and to inquire as to testing performed on the victim's skirt. "Defendant, however, has not demonstrated on this record the absence of strategic reasons for defense counsel's conduct or that, had counsel . . . taken the actions that defendant now points to, there was any likelihood of success" (People v Bombard, 187 AD3d 1417, 1420 [2020] [internal citations omitted]). Viewing the record as a whole, trial counsel, among other things, filed appropriate pretrial motions, made cogent opening [*4]and closing statements, effectively cross-examined witnesses and pursued a reasonable trial strategy such that we are satisfied that defendant received meaningful representation (see People v Rodriguez, 195 AD3d 1237, 1242 [2021], lv denied 37 NY3d 1061 [2021]).
Defendant's arguments regarding County Court's handling of an outburst by a juror during deliberations are unpreserved inasmuch as defendant failed to object, and in fact consented, to the procedure employed by the court and did not move to discharge the juror who had the outburst, or any other juror, as grossly unqualified (see People v Young, 160 AD3d 1206, 1209 [2018], lv denied 31 NY3d 1155 [2018]; see also People Lancaster, 143 AD3d 1046, 1051 [2016], lv denied 28 NY3d 1147 [2017]). Finally, given the seriousness of the offense and defendant's refusal to take any responsibility for his actions, we decline defendant's invitation to reduce the sentences imposed, which fall within the permissible statutory ranges, in the interest of justice (see generally People v Casalino, 204 AD3d 1078, 1083 [2022]; People v Dawson, 195 AD3d 1157, 1163 [2021], affd ___ NY3d ___ [Apr. 26, 2022]). Defendant's remaining contentions, including those set forth in his pro se brief, have been examined and have been found to lack merit.
Reynolds Fitzgerald, Ceresia and Fisher, JJ., concur.
Aarons, J.P. (dissenting).
The foreperson said it best — "how did you get this far if that's the case? . . . you shouldn't be here." The foreperson said this to one of the jurors, who was in seat No. 6, after this juror revealed during deliberations that she was a victim of rape — one of the crimes for which defendant was being tried. Juror No. 6 had not disclosed this fact during voir dire or on the juror questionnaire. In any event, County Court proceeded to question each juror, including juror No. 6, to determine if any of them was grossly unqualified. Such inquiry, however, was not "probing and tactful" (People v Buford, 69 NY2d 290, 299 [1987]) and, consequently, the court failed to ensure that the finding of guilt was the product of a fair and impartial jury. Although, as the majority notes, the court's handling of this issue is unpreserved, this grievous error, in my view, requires a new trial in the interest of justice. As such, I respectfully dissent.
After a jury has been sworn but before it renders a verdict, if a juror is found to be grossly unqualified to serve on the case, "the court must discharge such juror" (CPL 270.35 [1]). A juror is grossly unqualified "only when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" (People v Buford, 69 NY2d at 298 [internal quotation marks and citation omitted]). When presented with credible information that a juror may be grossly unqualified, a court is obligated to "conduct a 'probing and tactful inquiry' of the juror" (People v Kuzdzal, 31 NY3d 478, 486 [2018], quoting People [*5]v Buford, 69 NY2d at 299; see People v Dotson, 248 AD2d 1004, 1004 [1998], lvs denied 92 NY2d 851 [1998]). Whether to discharge a juror as being grossly unqualified turns on this probing and tactful inquiry and, if such inquiry has occurred, it is within the discretion of the court to discharge a juror (see People v Bailey, 258 AD2d 807, 807-808 [1999], lv denied 93 NY2d 1001 [1999]). That discretion, however, is "not unbounded" (People v Daniels, 218 AD2d 589, 590 [1995]).
The record reflects that the foreperson advised County Court that, while the jurors were deliberating on the previous day, things got "a little heated." The foreperson recounted that juror No. 6 "verbally attack[ed] one of the other jurors" and that she "came out and said that she had been raped and that she was a rape victim." The foreperson told the court that she tried to calm down juror No. 6, who was "like in tears." The foreperson, however, also stated that she had remarked to juror No. 6, "how did you get this far if that's the case? . . . you shouldn't be here." The foreperson then told the court, "it's an awkward situation . . . I think it really influenced — it certainly influences her, because by her body actions, . . . she was really upset. This morning she [came] in, she's very — a very verbal person, and this morning came in and has been very quiet and whatever." The foreperson then advised the court that she was shocked that juror No. 6 had not disclosed that she was a rape victim and that "everybody asked so many questions, and she never — she said, I thought I could get through this." Meanwhile, the foreperson stated that she thought that "well, you know, maybe she did, but she's not right now." The foreperson also reported that "another juror . . . was as upset as I was." After the court confirmed that juror No. 6 "did not check the victim box" on the juror questionnaire, it questioned every juror individually as to whether anything had transpired that caused him or her to be swayed or influenced so as to be distracted from the evidence or whether anything occurred that would affect his or her impartiality. Each juror answered in the negative and stated that he or she could be fair and impartial.
Regarding juror No. 6, County Court slightly deviated and posed additional questions to her. The court asked juror No. 6 about her qualifications to serve and whether anything had changed — specifically, "You know, were you a witness to a crime, convicted, those general questions, nothing's changed today? . . . That any personal experience of yours that you may have experienced will not influence your verdict in any way. Can you make that promise?" Even though juror No. 6 promised that she could remain uninfluenced by any personal experience, the court still pressed by asking, "Nothing at all has come to light that would change your mind?" Juror No. 6 responded in the negative, but the court continued, "In the last couple of days, in the last couple [*6]weeks, whatever?" Juror No. 6 answered, "No."
Following this initial questioning, it was the prosecutor who remarked, "You've got to take it another step with [juror No. 6]." After a break, County Court proposed bringing juror No. 6 back in and informing her that "it has come to light that you may have been the victim of a crime." It was then the prosecutor who said that the court had to specifically inquire that juror No. 6 was a victim of a rape or a sexual assault, to which the court said it would tell juror No. 6, "It has come to our attention that it was a sexual assault." When the court spoke to juror No. 6, however, it merely stated, "It has come to our attention that you may have been a victim of a crime at some point in your life." Notably, the court did not ask whether juror No. 6 was a sexual assault victim as it said it would do. In response, juror No. 6 nonetheless stated, "As a child," and that it involved her stepfather. Juror No. 6 explained that she did not mention what happened to her on the questionnaire because she did not believe that "it was a crime because nothing . . . ever proceeded from it." Juror No. 6 further explained that "[i]t just upset [her] that so many people yesterday . . . were getting emotionally involved when we are just based on the evidence that we were shown." Juror No. 6 stated that she got upset because "they were making it more personal." The court then asked juror No. 6 again, "maybe the reason why you didn't say anything, is there — can you let us know that? When during jury selection — because you said you felt as though it wasn't a crime. Is that what you said?" Juror No. 6 responded, "Yeah. I mean yes and no. But, I mean, I don't feel like I was a victim of a crime. I just feel it was — do you know what I mean?"
Juror No. 6 then affirmed her ability to remain impartial and stated that she would not be influenced by any personal experiences. She also, however, asked County Court if she could speak with it in private. The court answered in the negative but asked juror No. 6, "what's on your mind?" She remarked, "The reason this whole thing came about and arose, and why I spoke of it yesterday . . . it's hard to discuss without getting in too much detail what we discussed yesterday." She further explained, "I just feel like it's people are taking individual experiences themselves and with their employment, et cetera, et cetera versus — do you know what I mean?" The court pivoted to its main concern — whether she could remain fair and impartial. Juror No. 6 responded, "Absolutely."
In my view, County Court's inquiry did not meet the probing and tactful standard. Based on the allegations of rape made against defendant, juror No. 6's revelation of being a rape victim and the doubt expressed by the foreperson about juror No. 6's impartiality, it was incumbent upon the court, at the very least, to ask juror No. 6 about being a rape victim. Indeed, the court intended on asking [*7]juror No. 6 about being a sexual assault victim but, for some reason that is not apparent in the record, it never did. Merely asking whether juror No. 6 was a crime victim did not address the emotionally charged situation that the foreperson brought to the court's attention. The court's inquiry was therefore flawed from the outset.
County Court's inquiry likewise did not resolve the contradiction presented by juror No. 6's remark, "I don't feel like I was a victim of a crime," and by what the foreperson had reported to the court — juror No. 6 said "she was a rape victim." Although the court seemingly accepted juror No. 6's explanation that she did not feel like a victim of a crime, because "nothing . . . ever proceeded from it," juror No. 6 equivocated about her feelings. Whatever happened to juror No. 6 was significant enough for her to mention it to the other jurors. It was significant enough for juror No. 6 to markedly change demeanor within a day. It was also significant enough to bring her to tears. To be sure, an emotional outburst by itself does not mean that a particular juror is grossly unqualified to serve as a juror (see People v Spencer, 29 NY3d 302, 311 [2017]). Here, however, juror No. 6 doubted her own ability to proceed. She wanted to speak to the court in private. At least two jurors were upset that juror No. 6 had disclosed that she was a rape victim, and one of them questioned juror No. 6's impartiality. As such, there was more than an emotional outburst.
Additionally, juror No. 6 was not entirely forthright. When initially pressed about her qualifications, juror No. 6 repeatedly affirmed that nothing had come to light that changed her mind about being impartial. Her answers were specious, at best, in view of the information brought to light by the foreperson. Armed with that information, County Court asked juror No. 6 particular questions that were not directed to the other jurors and, even when juror No. 6 still said that nothing had transpired since jury selection that would impact her deliberations, the prosecutor commented that more probing of juror No. 6 was necessary. Once the court confronted juror No. 6 that it knew that she was a victim of a crime, it was then that juror No. 6 ably recalled that something had happened to her when she was a child. Moreover, it was not until near the end of the second round of questioning that juror No. 6 ultimately acknowledged that she had mentioned her past history to the other jurors. It is not clear why juror No. 6, despite the court's prodding, waited until this point to finally concede that she did make a personal revelation to the other jurors. It nonetheless calls into question her credibility.
Indeed, juror No. 6's comments and demeanor created confusion, if not more doubt, as to her ability to confine her deliberations to the evidence and to remain impartial. Juror No. 6 accused the other jurors of bringing their individual experiences and job experiences [*8]into the deliberations and, in her words, the other jurors were "making it more personal." Moreover, she apparently felt justified to do the same by telling them that she was a rape victim and, with that disclosure, "everybody asked so many questions" according to the foreperson. Juror No. 6 injected a very sensitive and personal matter into the deliberations and it took a toll on her, as evidenced by her emotional reaction and change in behavior.
It is true that juror No. 6 stated that she could "[a]bsolutely" remain impartial and that she could set aside her personal experiences when deliberating. Such unequivocal answers typically demonstrate that a juror is not grossly unqualified to serve (see People v Crider, 176 AD3d 1499, 1501 [2019], lv denied 34 NY3d 1157 [2020]; People v Peele, 73 AD3d 1219, 1220 [2010], lvs denied 15 NY3d 893, 894 [2010]). To be able to credit an unequivocal declaration of impartiality, however, it presupposes a probing and tactful inquiry. County Court had to ensure that juror No. 6 could be impartial and, to get that assurance, the court had to delve beyond why juror No. 6 did not mark on the juror questionnaire that she was a crime victim and probe her about being a rape victim and its impact upon her (see People v Thomas, 196 AD2d 462, 464-465 [1993], lv denied 82 NY2d 904 [1993]). 
In the absence thereof, County Court was left with nothing but speculation about the impartiality of juror No. 6 (see generally People v Cargill, 70 NY2d 687, 688-689 [1987]). That said, "each case must be evaluated on its unique facts" (People v Buford, 69 NY2d at 299), and the facts here are certainly unique. Taking into account that "[n]othing is more basic to the criminal process than the right of an accused to a trial by an impartial jury" (People v Branch, 46 NY2d 645, 652 [1979]), I would take corrective action in the interest of justice to reverse the judgment and order a new trial.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Defendant's argument, in his pro se brief, that the People failed to prove forcible compulsion is more appropriately raised in the context of a legal sufficiency argument. However, this contention is unpreserved because defendant failed to move to dismiss the indictment on this ground following the close of the People's proof (see People v Lancaster, 200 AD3d 1352, 1355 [2021], lv denied 38 NY3d 951 [2022]). Nevertheless, this argument is without merit given that the victim's testimony that defendant pushed her over the couch and held her down while she tried to get up adequately established the element of forcible compulsion (see Penal Law § 130.00 [8]; People v Williams, 152 AD2d 989, 989 [1989], lv denied 74 NY2d 821 [1989]).

Footnote 2: Defendant's oral and written statements were admitted into evidence at trial.
Footnote 3: Although defendant does not specifically challenge the weight of the evidence supporting his conviction of unlawful imprisonment in the second degree (see Penal Law § 135.05), we have reviewed the evidence and determined that it supports both convictions (see People v Garcia, 203 AD3d 1228, 1229 n [2022], lv denied ___ NY3d ___ [May 12, 2022]).