People v Johnson (2020 NY Slip Op 01668)





People v Johnson


2020 NY Slip Op 01668


Decided on March 12, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 12, 2020

109364

[*1]The People of the State of New York, Respondent,
v
Robert Johnson, Appellant.

Calendar Date: June 4, 2019

Before: Garry, P.J., Egan Jr., Aarons and Pritzker, JJ.


Paul J. Connolly, Delmar, for appellant.
James R. Farrell, District Attorney, Monticello (Meagan K. Galligan of counsel), for respondent.



Garry, P.J.
Appeal from a judgment of the Supreme Court (Schick, J.), rendered January 26, 2017 in Sullivan County, upon a verdict convicting defendant of the crime of predatory sexual assault against a child.
Defendant was charged with predatory sexual assault against a child after the victim disclosed that defendant had sexually assaulted her on multiple occasions, beginning in 2011 when she was 10 years old and continuing until May 2014. County Court (LaBuda, J.) denied defendant's motions to, among other things, dismiss the indictment, inspect the grand jury minutes and suppress statements and evidence. Following a jury trial, defendant was convicted as charged, and defendant's motion to set aside the verdict pursuant to CPL 330.30 was denied by County Court. Supreme Court (Schick, J.) sentenced defendant to a prison term of 25 years to life. Defendant appeals.
When this matter previously came before this Court (175 AD3d 14 [2019]), we held the appeal in abeyance and remitted the matter to Supreme Court for a reconstruction hearing to determine the circumstances surrounding a jury note marked as Court exhibit No. 1. As we noted therein, after the jury began deliberations, counsel and County Court agreed that trial exhibits could be provided to the jury upon its request without reconvening and then took a lunch break. The next entry in the trial record indicated that a jury note bearing the time 12:30 p.m. was received and marked as Court exhibit No. 1, requesting a DNA report and "[a] chronology of events starting with [defendant] dating [the victim's relative]." The DNA report was a trial exhibit, but no such chronology existed. With no further reference to Court exhibit No. 1, the record next stated that the court reconvened and accepted the jury's guilty verdict. The final entry in the trial record revealed that two notes from the jury announcing that it had reached a verdict were marked as Court exhibit No. 2 and Court exhibit No. 3. We remitted the matter to Supreme Court for a reconstruction hearing to determine "whether County Court's core responsibilities were triggered by its knowledge of [Court exhibit No. 1] or by circumstances that should have alerted the court to its presence" (id. at 19).
Supreme Court has now conducted the hearing and filed a transcript with its findings. At the hearing, the County Judge who had presided over the trial and the court clerk testified that neither had any specific memory of Court exhibit No. 1. The clerk testified, based upon the minutes that she had transcribed at the time, that she received the note and, as agreed, provided the DNA report to the jury without advising the court and counsel. She stated that her routine procedure would have been to advise the court of the request for a chronology, as it was not a trial exhibit. However, she believed that she had not done so in this case as the minutes indicated that a second note was received at 1:05 p.m., before the court reconvened, advising that the jury had reached a verdict.[FN1] According to the minutes, the court reconvened to accept the verdict at 1:20 p.m.
The judge testified that he remembered the trial but had no memory of the note. The judge stated that it was his ordinary practice, upon counsel's agreement, to permit trial exhibits to be provided to the jury without notifying counsel or reconvening, but that a court clerk or court officer would notify the court of any other jury inquiry. The judge further testified that his invariable practice upon being advised of such an inquiry was to notify counsel of the note's specific content and confer with them about the appropriate response. Defendant's trial counsel testified that she had never seen the note before the reconstruction hearing and, if she had seen it, she would have requested "clarification." Following this testimony, Supreme Court made a factual determination that the witness testimony was credible and that there was no evidence that County Court was ever notified of the note's existence at the time of trial. We agree that the hearing established that the court did not know about the note. We further find that nothing in the testimony gave rise to any reason for the court to suspect that such an inquiry might have been received in its absence. Thus, nothing in the circumstances indicates that the court should have known about the note.
It is well established that a trial court's "core responsibility" upon receiving a substantive jury inquiry during deliberations in a criminal trial is to provide counsel with "meaningful notice" of the note's specific content and to give the jury a "meaningful response" (People v Kisoon, 8 NY3d 129, 134 [2007]; see People v O'Rama, 78 NY2d 270, 276 [1991]; see CPL 310.30). Once this responsibility has arisen, a trial court's failure to comply is a mode of proceedings error that requires reversal and a new trial without regard to whether the error was preserved (see People v Morrison, 32 NY3d 951, 952 [2019]; People v Parker, 32 NY3d 49, 59 [2018]; People v Mack, 27 NY3d 534, 536 [2016]; People v O'Rama, 78 NY2d at 279-280; but see People v Meyers, 33 NY3d 1018, 1020 [2019]). It is also well established, however, "that not every departure from the O'Rama procedure or violation of CPL 310.30 constitutes a mode of proceeding error" (People v Mack, 27 NY3d at 539; see People v Nealon, 26 NY3d 152, 158 [2015]), and that this designation is reserved for a limited class of errors that "go to the essential validity of the process and [are] so fundamental that the entire trial is irreparably tainted" (People v Mack, 27 NY3d at 541 [internal quotation marks, brackets and citation omitted]). We are unpersuaded that the failure that apparently occurred here reached this level.
In People v Silva (24 NY3d 294 [2014]) and People v Hanson (24 NY3d 294 [2014]), the Court of Appeals held that the trial courts committed mode of proceedings errors by failing to notify counsel of jury notes before the juries in each case reached their verdicts, even though the transcripts in both cases failed to establish whether the courts were aware that the notes had been submitted. However, these cases may be distinguished. There, the Court of Appeals held that "[i]f there was uncertainty regarding the number of notes that had been forwarded during deliberations, the best practice would have been for the judge to inquire before the verdict was announced" (id. at 300-301). Here, by contrast, the trial record and the reconstruction hearing transcript, taken together, affirmatively establish that County Court did not know of the existence of Court exhibit No. 1, and that nothing in the surrounding circumstances gave rise or should have given rise to such uncertainty.
People v Cruz (14 NY3d 814, 815-816 [2010]), which also involved a jury note that was not addressed before the jury reached a verdict, may likewise be distinguished. In that case, as in Silva and Hanson, "[n]othing in the record suggest[ed] that the judge received the jury note" (id. at 815). There, as here, the matter was remitted for a reconstruction hearing in which the trial judge testified to having no independent memory of the circumstances but that, according to standard procedure, the proceeding would have been reconvened and counsel notified had the note's existence been known (id. at 816). Despite this factual similarity, the reversal of the defendant's convictions in Cruz was not based on a failure to comply with O'Rama procedures but, instead, upon the determination that the defendant rebutted the presumption of regularity by demonstrating that the jury had requested, and might have received, a critically important document that was not in evidence (id.). This document was the defendant's signed statement to police, which contained admissions and contradicted the misidentification defense that the defendant raised at trial (id.). The Court of Appeals based its decision upon the fact that the jury might have received this document in error, and did not reach the defendant's argument that CPL 310.30 and O'Rama were violated. Thus, Cruz does not stand for the proposition that a trial court can commit an O'Rama mode of proceedings error by failing to notify counsel of a jury note, even when it does not know and has no reason to know that the note exists.
Here, the jury did not receive the chronology it requested in Court exhibit No. 1, which did not exist. Moreover, unlike the defendant's incriminating statement in Cruz, the chronology requested by the jury involved background factual information regarding a former relationship between defendant and a relative of the victim that had no relevance to any of the elements of the charged crime or to the jury's process of reaching a verdict (compare People v Parker, 32 NY3d at 54 [jury requested fingerprint evidence and the testimony of the complainant and his wife]; People v Morrison, 32 NY3d at 953 [jury note indicated that the jury had reached a decision on two counts but was struggling with a third]; People v Silva, 24 NY3d at 297 [jury requested a wire transcript mentioning a gun and the jury charge on weapon possession]; People v Hanson, 24 NY3d at 298 [jury requested readback of a detective's testimony]; People v O'Rama, 78 NY2d at 275 n 2 [juror's note advised that the jury was "split down the middle"]). We are mindful that the Court of Appeals has rejected pre-O'Rama precedent that formerly evaluated whether a defendant was prejudiced by a trial court's failure to respond to a jury note (see People v Parker, 32 NY3d at 69 n 5; People v Silva, 24 NY3d at 300 n 1). Nevertheless, in Silva, the Court of Appeals found that a trial court's O'Rama error did not require reversal of the defendant's drug-related convictions because the jury inquiry did not pertain to those convictions, but only to a conviction for weapon possession (People v Silva, 24 NY3d at 301 n 2). Likewise, in People v Walston (23 NY3d 986, 990 [2014]), the defendant's manslaughter conviction was reversed because of a trial court's mode of proceedings error, but the Court of Appeals held that reversal of a separate conviction on another charge was not required because the note did not address that offense.
Thus, reversal of a conviction is not required when a trial court fails to address a jury inquiry that has no direct relevance to that conviction (see People v Henry, 173 AD3d 1470, 1473 [2019], lv denied 34 NY3d 932 [2019]). This makes sense, as the purpose of the O'Rama requirement that counsel must receive meaningful notice of a substantive jury inquiry is "to ensure counsel's opportunity to frame intelligent suggestions for the fairest and least prejudicial response" (People v Kisoon, 8 NY3d at 134; see People v Parker, 32 NY3d at 59; People v O'Rama, 78 NY2d at 276-277). Although counsel did not have that opportunity here, the jury's inquiry did not involve a critical issue of law or evidence in which counsel's participation would potentially have had an impact on the jury's consideration of the elements of the charged crime. Further, the fact that the jury reached its verdict only 35 minutes after making the inquiry indicates that the jury itself did not perceive the issue to be significant or important. In a different context, we have repeatedly held that a jury that renders a verdict before receiving a response to an inquiry "unambiguously indicate[s] that it [i]s no longer in need of [the] previously requested information" (People v Robtoy, 144 AD3d 1190, 1193 [2016], lv denied 28 NY3d 1150 [2017]; see People v Douglass, 115 AD3d 1055, 1057 [2014]; People v Sorrell, 108 AD3d 787, 793 [2013], lv denied 23 NY3d 1025 [2014]).
As we noted when this matter was previously before us, to hold that a trial court "commit[s] a mode of proceedings error by failing to ask a jury whether there are any outstanding notes, even when it has no reason to suspect that such notes might exist, would amount to a requirement that it is a core responsibility of every trial court to make that inquiry of every jury in every trial, just in case — an obligation that our law has never imposed" (175 AD3d at 17). We decline to expand the reach of the O'Rama rule so drastically in the circumstances presented here. Accordingly, we find that reversal and a new trial are not required as a result of County Court's handling of Court exhibit No. 1, and we turn to the remaining issues raised in defendant's appeal.
County Court did not err in denying defendant's motions to inspect the grand jury minutes and to dismiss the indictment based upon alleged defects in that proceeding. Our review of the grand jury minutes reveals no prosecutorial misconduct or other errors of any nature that warrant dismissal of the indictment (see CPL 210.35 [5]; People v Newman, 169 AD3d 1157, 1157-1158 [2019]; People v Malloy, 166 AD3d 1302, 1304 [2018], affd 33 NY3d 1078 [2019]). To the extent that, on appeal, defendant asks this Court to release the grand jury minutes to his appellate counsel and allow supplemental briefing on this issue, such relief should have been requested by a motion on notice to the People requesting such disclosure in furtherance of the appeal (see generally Rules of App Div, All Depts [22 NYCRR] § 1250.4).
Defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence on the ground that the victim's testimony was too unreliable to prove beyond a reasonable doubt that defendant had sexual contact with her. Defendant failed to preserve his legal sufficiency argument, as his general trial motion for dismissal was not directed at any specific error (see People v Gray, 86 NY2d 10, 19-21 [1995]; People v Perillo, 144 AD3d 1399, 1400 [2016], lvs denied 29 NY3d 948, 951 [2017]). Nevertheless, this Court's weight of the evidence review requires us to determine whether the elements of the charged crime were proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Chaneyfield, 157 AD3d 996, 996 [2018], lv denied 31 NY3d 1012 [2018]).
The victim testified that she had known defendant since her infancy because he had formerly dated a relative with whom she then resided. After defendant and the relative ended their relationship, defendant obtained custody of the victim and a sibling.[FN2] At the time of the incidents that gave rise to defendant's conviction, the victim resided with defendant, his wife, the sibling and others. The victim testified that defendant first had sexual contact with her when she was 10 years old. She said that defendant was helping the victim apply medication to her head when he removed a towel that she was wearing and touched her naked breasts. On the next occasion, defendant walked into the victim's bedroom and touched her breasts and "butt" through her clothes. The victim said that she told no one because she did not know what was "really happening." Thereafter, on 10 or 15 subsequent occasions, defendant entered the victim's bedroom at night, locked the door, took off his clothes and those of the victim, got on top of her and touched her breasts and vagina. Beginning when the victim was in sixth grade, defendant also put his mouth on her vagina. The victim testified that she did not disclose these actions to anyone because defendant said he would put her in foster care if she did so, and because she did not think defendant's wife would believe her. On a night in May 2014, defendant had sexual contact with the victim as previously described, and also attempted to insert his penis into the victim's vagina. The victim said that this caused her pain, that defendant's penis "didn't go in," and that he said, "[W]e have to try it again." He then used a towel to wipe something off the sheet that the victim did not see. In addition to the sheet, a comforter was also on the bed, pushed to the side. On another night shortly thereafter, defendant returned to the victim's bedroom and, after other forms of sexual contact, successfully inserted his penis into her vagina. The victim said that she covered her ears to avoid hearing sounds that defendant made and that she saw "sperm" come out of his penis. Defendant again used a towel to wipe off the bedding, which had not been changed since the last incident.
After this occurrence, the victim contacted her mother through social media and told her what defendant had done, and police were called. On cross-examination, the victim acknowledged that defendant was strict, that she did not like him and that she had sometimes lied to him to avoid being caught in wrongdoing. However, she denied that her mother had "put [her] up to this" or that she wanted to live with her mother instead of defendant, saying that she wished to continue to live with defendant's wife, whom she thought of as a mother.[FN3]
During an interview with a State Police investigator, which was video-recorded and entered into evidence, defendant denied that he had ever touched the victim sexually. He said that some of his bodily material might be on the sheets from the victim's bed, as he sometimes used them when he slept on a sofa, but he repeatedly stated that there was no other reason that his bodily fluids or DNA should be found on the victim's bedding. Following this interview, the investigator went to defendant's home, obtained consent from defendant's wife to search the victim's bedroom and secured the comforter and fitted sheet that were on the victim's bed. At trial, the victim testified that this sheet and comforter were on her bed on the two occasions when defendant had or attempted sexual intercourse with her.
Forensic investigators testified that seminal fluid with a high concentration of sperm was found on cuttings from the comforter and sheet, and that the mixture profiles on these items were consistent with defendant's DNA, admixed with at least one additional donor, with defendant as the major contributor. The calculation of a conditional match probability revealed that the profile was 207.6 quadrillion more times likely to be observed if the donors were defendant and the victim than if they were two other individuals.
A nurse practitioner with training in child abuse testified that she examined the victim, that the examination was normal and that there was no damage to the victim's hymen. She stated that such a finding was not inconsistent with sexual assault, as the hymen was elastic at the victim's age, did not always tear upon penetration and, if it did, could repair itself quickly. The nurse practitioner stated that she could neither confirm nor deny that the victim had been sexually abused.
Defendant testified on his own behalf, denying that he had ever had sexual contact with the victim. He characterized himself as a strict caregiver, stating that he had "paddled" the victim for wrongdoing, and describing incidents when the victim had lied to him. As for the DNA found on the victim's bedding, defendant asserted that he had a sexual relationship with a babysitter who took care of the victim's sibling and that he and the babysitter had had intercourse in a spare bedroom in May 2014. He claimed that the sheet and comforter taken by police were on the bed in the spare room at that time. The babysitter was called by the People as a rebuttal witness. She denied that she and defendant had ever had a sexual relationship.
Had the jury credited defendant's testimony, a different verdict would not have been unreasonable (see People v Taft, 145 AD3d 1090, 1091 [2016], lv denied 29 NY3d 953 [2017]). Accordingly, this Court must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" to determine if the verdict is supported by the weight of the evidence (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citations omitted]; accord People v West, 166 AD3d 1080, 1084 [2018], lv denied 32 NY3d 1129 [2018]). Viewing the evidence in a neutral light and deferring to the jury's credibility assessments, we find that the verdict is amply supported by the weight of the evidence (see Penal Law § 130.96; People v Chaneyfield, 157 AD3d at 1000; People v Robinson, 156 AD3d 1123, 1128 [2017], lv denied 30 NY3d 1119 [2018]; People v St. Ives, 145 AD3d 1185, 1188 [2016], lv denied 29 NY3d 1036 [2017]).
Defendant contends that he was denied a fair trial when the People elicited testimony from the victim that defendant's wife did not believe the victim's claims until after police found "things on the sheets." Defendant did not object to this testimony and thus failed to preserve for appellate review his current claim that this testimony was inadmissible (see People v Cayea, 163 AD3d 1279, 1280 [2018], lv denied 32 NY3d 1109 [2018]; People v Davidson, 111 AD3d 848, 849 [2013], lv denied 22 NY3d 1087 [2014]). We will nevertheless review the argument because he contends that his trial counsel was ineffective for failing to preserve the alleged error. Contrary to defendant's claim, the victim's testimony regarding the wife's beliefs was not inadmissible hearsay, because it was not elicited to prove the matter asserted — that is, what the wife did or did not believe about defendant's guilt (see People v Huertas, 75 NY2d 487, 491-492 [1990]; Jerome Prince, Richardson on Evidence §
8-101 [Farrell 11th ed 1995]). Instead, read in context, the testimony was elicited for the relevant purpose of explaining that the victim delayed in disclosing defendant's actions because she thought — rightfully — that she would not be believed (compare People v Hughes, 114 AD3d 1021, 1022-1023 [2014], lv denied 23 NY3d 1038 [2014]). For similar reasons, the testimony was not improper lay opinion evidence, as it was not elicited to prove either defendant's guilt or the wife's opinion of defendant's guilt (compare People v Koury, 268 AD2d 896, 897 [2000], lv denied 94 NY2d 949 [2000]; Jerome Prince, Richardson on Evidence § 7-202 [Farrell 11th ed 1995]). Finally, any slight potential prejudice that may have resulted from this collateral testimony did not "substantially outweigh[]" its probative value (People v Mateo, 2 NY3d 383, 424-425 [2004], cert denied 542 US 946 [2004]; accord People v Caruso, 6 AD3d 980, 984-985 [2004], lv denied 3 NY3d 704 [2004]). Thus, defense counsel was not ineffective for failing to object (see generally People v Caban, 5 NY3d 143, 152 [2005]).[FN4]
Defendant next argues that his trial counsel was ineffective for failing to object to portions of his recorded interrogation in which the investigator challenged the credibility of defendant's denials with remarks to the effect that the investigator did not think that the victim would make up her allegations. Defendant's argument that these remarks were impermissible lay opinion evidence, prejudicial and irrelevant is unpreserved (see CPL 470.05 [2]), and no modification would have been warranted if the claim were properly before us. A confession is not rendered inadmissible solely because police expressed doubts about the defendant's veracity during the questioning (see People v Tarsia, 50 NY2d 1, 12 [1980]). Here, the challenged remarks were not testimonial in nature, were not before the jury as proof either of defendant's guilt or of the investigator's opinion on that score and, therefore, were not improper opinion evidence or otherwise inadmissible.
Defendant next contends that he was deprived of a fair trial by prosecutorial misconduct during cross-examination and summation. Defendant objected to only one of the allegedly improper comments and thus, for the most part, failed to preserve this challenge for appellate review (see People v Ormsby, 119 AD3d 1159, 1161 [2014], lv denied 24 NY3d 963 [2014]; People v Carney, 110 AD3d 1244, 1245 [2013]). We review defendant's unpreserved claims because he contends that defense counsel's failure to object to the alleged misconduct constituted ineffective assistance of counsel, and we find no merit in that claim. The prosecutor did not violate defendant's right to silence either by cross-examining him on why he had not mentioned his alleged affair with the babysitter before the trial, including when speaking with police, or by arguing during summation that his failure to do so indicated that the claimed affair was fabricated. "[W]here, as here, a defendant speaks to the police and omits exculpatory information which he [or she] presents for the first time at trial, the defendant may be impeached with the omission" (People v Prashad, 46 AD3d 844, 844 [2007], lv denied 10 NY3d 815 [2008]; see People v Savage, 50 NY2d 673, 677-678 [1980], cert denied 449 US 1016 [1980]; People v Mosley, 121 AD3d 1169, 1173 [2014], lv denied 24 NY3d 1086 [2014]). The prosecutor's comments to the effect that defendant was trying to "deceive" and "hide the truth" from the jury were direct responses to defense counsel's arguments about this alleged affair and were fair responses thereto (see People v Deshane, 160 AD3d 1216, 1218 [2018], lv denied 31 NY3d 1146 [2018]). Likewise, it was not improper for the prosecutor to argue that defendant tailored his testimony to the proof by first claiming that he had this affair only after he learned about the DNA evidence on the victim's bedding (see Portuondo v Agard, 529 US 61, 73 [2000]; People v King, 293 AD2d 815, 816-817 [2002], lv denied 98 NY2d 698 [2002]).
The prosecutor's fleeting remark about the lack of evidence that the victim's mother wanted to be part of the victim's life was a direct response to defendant's argument that the victim had lied because she wanted to live with her mother; it did not improperly shift the burden of proof from the People to defendant (compare People v Casanova, 119 AD3d 976, 977 [2014]; People v Forbes, 111 AD3d 1154, 1158-1160 [2013]). The prosecutor's comments about the victim's honesty were, for the most part, fair responses to defendant's repeated arguments in summation that she had a history of lying to get what she wanted and that she had lied about defendant's actions (see People v Hartle, 159 AD3d 1149, 1154 [2018], lv denied 31 NY3d 1082 [2018]; People v Heiserman, 127 AD3d 1422, 1424 [2015]). To the extent that some of the prosecutor's remarks may have improperly implied that she personally believed that the victim was credible, County Court gave an appropriate curative instruction upon defendant's objection to one such remark and, following the summation, again instructed the jury that counsels' arguments were not evidence and that the jury was the sole judge of credibility (see People v Devictor-Lopez, 155 AD3d 1434, 1437 [2017]). "[T]he challenged statements, in our view, were not pervasive or frequent and fell short of the sort of flagrant misconduct that would have deprived defendant of a fair trial" (People v Hartle, 159 AD3d at 1154). We find no merit in defendant's other claims of prosecutorial misconduct. Accordingly, defense counsel's failure to object to the prosecutor's cross-examination and summation did not deprive defendant of the effective assistance of counsel (see People v Pratt, 162 AD3d 1202, 1204-1205 [2018], lv denied 32 NY3d 940 [2018]; People v Cox, 129 AD3d 1210, 1214-1215 [2015], lv denied 26 NY3d 966 [2015]; People v Albanese, 38 AD3d 1015, 1019 [2007], lv denied 8 NY3d 981 [2007]). Viewed as a whole, the trial record reveals that defendant received meaningful representation (see People v Every, 146 AD3d 1157, 1163-1166 [2017], affd 29 NY3d 1103 [2017]; People v Goldston, 126 AD3d 1175, 1178-1179 [2015], lv denied 25 NY3d 1201 [2015]).
Finally, defendant argues that his sentence is harsh and excessive in view of his lack of a serious criminal record or prior history of pedophilic behavior. In view of the victim's vulnerability, the severity of defendant's offense and his lack of remorse, we find no abuse of discretion or extraordinary circumstances warranting a reduction of his sentence in the interest of justice (see People v Kalina, 149 AD3d 1264, 1267-1268 [2017], lv denied 29 NY3d 1092 [2017]; People v Martinez, 141 AD3d 1007, 1008-1009 [2016], lv denied 28 NY3d 1147 [2017]).
Egan Jr., Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The clerk did not testify about the third note, which also advised that the jury had reached a verdict, and the clerk's minutes include no mention of this note. The circumstances surrounding its marking as a court exhibit remain unexplained. Notably, defendant makes no claim of error with regard to this note.

Footnote 2: The victim testified that her father was in and out of jail and that she did not know where her mother was until they eventually made contact through social media.

Footnote 3: After defendant's arrest, the victim moved to the home of a family member who was not her mother.

Footnote 4: Defendant also contends on appeal that his trial counsel should have objected when the People elicited his testimony that he had not spoken with his wife in a year. However, this testimony was not, as defendant now suggests, related to the victim's testimony about the wife's beliefs regarding his guilt. Instead, after defendant testified on redirect that the victim's sibling was residing with the wife, the prosecutor asked him on re-cross-examination how long it had been since he had spoken to her, and defendant gave the challenged response. The testimony was relevant to the credibility of defendant's testimony about the sibling, had nothing to do with the wife's beliefs about defendant's guilt and was not improper.