People v Monahan
2026 NY Slip Op 03703
June 11, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Kevin Monahan, Appellant.

Decided and Entered:June 11, 2026
CR-24-1422
Calendar Date: April 28, 2026
Before: Garry, P.J., Clark, Fisher, Mackey And Ryba, JJ.

Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
J. Anthony Jordan, District Attorney, Fort Edward (Christian P. Morris of counsel), for respondent.

[*1]
Fisher, J.
Appeal from a judgment of the County Court of Washington County (Adam Michelini, J.), rendered March 1, 2024, upon a verdict convicting defendant of the crimes of murder in the second degree, reckless endangerment in the first degree and tampering with physical evidence.
In April 2023, a group of seven young adults drove to a party in the Town of Hebron, Washington County. The group of friends were dispersed between two SUVs and one motorcycle. At approximately 9:45 p.m., the three vehicles drove up defendant's driveway, believing that defendant's house was the location of the party. After being awoken by the sound of the vehicles, defendant exited his house with a shotgun onto a deck overlooking the driveway. As the vehicles were exiting the driveway, the shotgun discharged twice — the second shot striking one of the vehicles and causing fatal injuries to the victim. Although defendant and his wife initially told law enforcement officers several times that they had been "sound asleep" and were unaware of anyone coming up their driveway that evening, the ensuing investigation revealed inconsistencies with their version of events.
Defendant was charged by indictment with murder in the second degree (depraved indifference), reckless endangerment in the first degree and tampering with physical evidence. Following a jury trial, during which defendant testified that the fatal shot was the result of an accidental discharge due to him tripping and stumbling into the deck railing, defendant was found guilty as charged. County Court sentenced defendant to a prison term of 25 years to life for the depraved indifference murder conviction, a concurrent prison term of 2⅓ to 7 years for the reckless endangerment conviction and a consecutive prison term of 1⅓ to 4 years for the tampering with physical evidence conviction. Defendant appeals.
We affirm. Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. In reviewing "the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime[s] proved beyond a reasonable doubt" (People v Williams, 239 AD3d 1090, 1091 [3d Dept 2025] [internal quotation marks and citations omitted], lv denied 44 NY3d 985 [2025]). "Whereas for an evaluation of the weight of the evidence, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Smith, 237 AD3d 1367, 1369 [3d Dept 2025] [internal quotation marks and citations omitted], lv denied 43 NY3d 1059 [2025]). In [*2]weighing the evidence, "this Court affords great deference to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Marcantonio, 238 AD3d 1262, 1263 [3d Dept 2025] [internal quotation marks, brackets, ellipsis and citation omitted]).
As charged to the jury, a person is guilty of murder in the second degree when, "[u]nder circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). "A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person" (Penal Law § 120.25). Depraved indifference is a culpable mental state that requires a "highly fact-specific inquiry," and "is best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (People v Bender, ___ NY3d ___, ___, 2026 NY Slip Op 01444, *1 [2026] [internal quotation marks and citation omitted]). Such mental state "is embodied in conduct that is so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" (People v Suarez, 6 NY3d 202, 214 [2005] [internal quotation marks and citation omitted]). As further relevant to "both charges, a person acts with the requisite recklessness when he or she is aware of and consciously disregards a substantial and unjustifiable grave risk of death to another person and that the disregard of this risk constitutes a gross deviation from the standard of conduct that a reasonable person would have observed in the situation" (People v Dorvil, 234 AD3d 1106, 1108 [3d Dept 2025] [internal quotation marks, brackets and citations omitted], lv denied 44 NY3d 982 [2025]). As additionally charged, "[a] person is guilty of tampering with physical evidence when[,] . . . [b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he [or she] suppresses it by any act of concealment, alteration or destruction" (Penal Law § 215.40 [2]).
The trial evidence demonstrated that, before the shooting, defendant and his wife had lived in the same house for over 35 years. On the night of the incident, defendant and his wife were asleep when the victim and her friends turned onto their driveway at approximately 9:45 p.m. Defendant's wife testified that defendant woke her up, told her there was a motorcycle revving its engine in the driveway along with two other vehicles, and that she should stay away from the [*3]windows. According to the wife, defendant took his shotgun from the side of the bed and went downstairs and onto the deck. The wife testified that, while she was hiding upstairs, she saw the outdoor lights turn on and heard two gunshots, followed by defendant returning inside to check on her. The wife explained that she never asked if defendant had fired those shots and did not recall if he had told her that he did, but that they were both frightened by the incident and ultimately called 911 after she saw spotlights shining toward a neighbor's house and then their house. She further testified that their house is surrounded by seasonal homes, and there are break-ins "all the time" — including an incident when they had first moved in where an elderly couple had been "beaten" during a home invasion.
The People presented testimony from the victim's friends who were in the three vehicles during the shooting. This testimony established that the friends did not have an exact address when they left for the party, but that they believed the location resembled what turned out to be defendant's house. After arriving and not seeing any lights or activity, the two SUVs stopped partway up the driveway to discuss the possibility that they were at the wrong house, ultimately confirming that they were. While the SUVs were turning around to leave, lights came on inside and outside of the house, followed by a "loud noise." A passenger in the same vehicle as the victim testified that she observed a man standing on the deck with a gun and then heard a noise and saw a "white flash." Although she did not recall the exact positioning of the gun at the moment of the white flash, she saw the man pointing the gun toward the vehicles and observed that it was parallel to the ground. While the vehicle was in motion and facing down the driveway, she heard another shot and what sounded like glass breaking inside the vehicle. Another passenger in the same vehicle also heard two gunshots, testifying that he heard "something go against the car" after the first shot was fired and that the second shot struck the vehicle, ultimately hitting the victim. The driver of the motorcycle testified that he had been between the two SUVs discussing the party location, and heard the first shot as he started to leave. The collective testimony of the friends revealed that the shots were within a few seconds of each other and that the second shot had occurred while the vehicles were turning around or already heading down the driveway. Several friends also testified that they drove away at a high rate of speed, and there was screaming and honking coming from the vehicle occupied by the victim. After leaving defendant's property, the friends called 911 and pulled over to the side of the road to perform CPR on the victim.
Three neighbors also testified during the People's case-in-chief. Their testimony confirmed observations of two vehicles and a motorcycle traveling up defendant's driveway during the [*4]evening of the incident. One neighbor heard noises that she described as fireworks. The other two neighbors testified that they heard two gunshots, saw the vehicles driving down the driveway at a fast rate of speed, and each called 911 to report the incident. One neighbor further specified that, at the time of the second gunshot, one of the vehicles and the motorcycle had already been moving down the driveway. He also explained that he heard honking from one of the vehicles as it drove away. Following the departure of the vehicles and before the police arrived, a spouse of one of the neighbors observed "small lights moving around at [defendant's] residence."FN1
The People's proof at trial also included testimony from multiple first responders, law enforcement officers and forensic scientists. A 911 dispatcher testified that she received multiple calls reporting the incident and directed first responders to the roadside location of the friends and defendant's house — including the paramedic who first evaluated the victim and determined that she had succumbed to a gunshot wound. The 911 dispatcher testified that, besides receiving calls from neighbors and the victim's friends, defendant also called several times, questioning why there was a police vehicle in his driveway and expressing a desire to be left alone so he could return to bed. In response to his questions, the 911 dispatcher told defendant that the police were searching for a party related to a noise complaint, to which he responded that he had been "sound asleep" and that the noise could have been "guys hunting with dogs at night."
Law enforcement officers who reported to defendant's house testified that they stopped partway up the driveway and attempted to speak with defendant, who initially refused to meet with them but eventually invited officers up to his house. As depicted in a police sergeant's bodycam footage, defendant insisted that he was not aware of any incidents that night because he was "sound asleep." The wife further told officers that there had not been anyone at the residence that night and she was unaware of anyone coming up the driveway. According to law enforcement officers executing a search warrant at defendant's house the following morning, no shotgun shells or wadding were found in the areas along defendant's lawn, deck or driveway. A state trooper testified that he located a shotgun in defendant's bedroom and an empty shell for a "slug round" in a box inside the home. In examining the shotgun, no fingerprints were found. State Police investigators explained the shooting reconstruction analysis that they performed, and shared the results indicating that the shot which hit the vehicle entered in a downward direction from an elevated position while the victim was "facing down the driveway, away from the house."
A former forensic scientist with the State Police testified that she examined a shotgun slug discovered under a front seat in the vehicle that had been occupied [*5]by the victim and determined that it had been fired from defendant's shotgun. In further examining the shotgun, she determined that there was no apparent gunpowder residue in the bore or noticeable defects with the trigger. She further explained that she performed a "drop test" with defendant's shotgun and that the shotgun did not demonstrate any defects or discharge in any of her tests. However, she did acknowledge that the shotgun discharged when she dropped it on its muzzle from a four-foot height, but testified that she could not determine whether the safety had been engaged prior to the drop and, therefore, was unable to extract any significance from the occurrence. Another forensic scientist testified that he performed a DNA analysis on five swabs from various locations on the shotgun, as well as the shotgun shell that was found in defendant's house. He explained that, although the majority of the swabs were consistent with at least one or two donors, there was insufficient genetic information to identify a source. However, with respect to the forearm swab of the shotgun, he was able to determine that defendant was a "major contributor."
For his part, defendant testified that their house is in a rural area, and he recounted multiple home invasions or robberies perpetrated against neighbors and a local business. On the night of the incident, defendant stated that he was awoken by the sound of vehicles and headlights coming up his driveway. He testified that he instructed his wife to get dressed in "dark clothing in case [they] had to go out in the woods" and handed her a loaded revolver. According to defendant, he believed there was an "invasion" because it appeared the driver of the motorcycle "had been there before" and was operating as a "scout" by driving up to the "intimate" part of their property, revving its engine and "trying to wave the other cars up to the house" — which had "blocked" the driveway to prevent defendant from leaving. He explained that he wanted to be the "target" rather than his wife, and that he turned on the lights and went outside with his shotgun in his right hand to get their "attention." Although he did not know how many occupants were in each vehicle, defendant testified that he assumed there were five people in each. After not being able to satisfactorily get their attention, defendant testified that he fired a "warning shot" up into the air from a far corner of the deck. In doing so, he testified that he "turned [his] back" to the vehicles and fired in the opposite direction because he did not want to escalate the situation. Although the motorcycle slowly left, defendant testified that the two vehicles started to come closer to the house. He then loaded another shell into the shotgun and moved toward the portion of the deck nearest to the vehicles with the barrel of the gun pointed downwards. Defendant testified that one of the vehicles made a "hard" turn to leave, and the other was "[h]ardly moving" but had [*6]turned to face down the driveway.
According to defendant, as he moved to get a better vantage point of the vehicle occupied by the victim, which kept stopping and starting, he tripped in his flip-flops over raised nails, lost his balance and "got involved with the gun in th[e deck] post somehow, and the gun went off." Defendant maintained that he did not pull the trigger and that the gun went off because he hit the deck post "really hard." After the gun went off, defendant stated he looked toward the vehicle and did not see any damage or signs of a problem such as screaming or honking. He further testified that he "thought that the angle of the gun would have made the bullet go behind the [vehicle] and out into the field," and later said that he believed he saw the slug hit the ground. He testified that he put one spent shell in the house and left the other on the deck, turned off all the outside and indoor lights and then used a flashlight to look for his cell phone in the basement. He explained how traumatized he and his wife had been, and that he ultimately called the police after seeing what appeared to be people with long guns at his neighbor's house. Defendant acknowledged that he had a gun cleaning kit in the basement and admitted that he initially had not told the truth about being "sound asleep." After learning that the victim had passed away, he testified to feeling "[h]orrible" and that it was "indescribable . . . . [that he] took somebody else's life."
When viewing the foregoing evidence in the light most favorable to the People, the evidence was legally sufficient to sustain each of defendant's convictions. Contrary to defendant's contention, the evidence established that he acted with the requisite depravity and reckless conduct to support the murder and reckless endangerment convictions (see People v Dorvil, 234 AD3d at 1110-1111). Undisputed forensic evidence established that the shotgun slug that struck and killed the victim had been fired from defendant's weapon while the vehicle was pointing down the driveway toward the exit. Testimony from multiple witnesses indicated that two shots were fired within a few seconds of each other, while the vehicles were in the process of leaving. One witness observed a man pointing a shotgun in the direction of the vehicles at the time of the first shot, which is corroborated by a second witness who heard debris kick up against the vehicle thereafter. When the second shot struck the vehicle, the testimony demonstrated that the vehicles were near each other on the driveway and leaving — posing no threat to defendant. These facts support a valid line of reasoning and permissible inferences from which a rational jury could have concluded that defendant fired multiple shots toward the three vehicles — which, in many respects, is akin to shooting into a crowd, one of the "[q]uintessential examples" of depraved indifference (People v Saurez, 6 NY3d at 214). To the extent that defendant suggests that [*7]he had no way of knowing how many people were actually in each vehicle, and therefore no such "crowd" existed, such contention does not negate the reasonable conclusion that his conduct evinced a depraved indifference to human life and that he acted recklessly by being aware of but consciously disregarding a substantial and unjustifiable grave risk of death to the motorists who he did know about (see People v Dorvil, 234 AD3d at 1111; see also People v Perkins, 203 AD3d 1337, 1339 [3d Dept 2022], lv denied 38 NY3d 1035 [2022]; People v Maeweather, 172 AD3d 1646, 1648-1649 [3d Dept 2019], lv denied 34 NY3d 1017 [2019]).
As relating to the tampering with physical evidence conviction, the People's evidence established that defendant discharged his shotgun twice, but that it lacked gunpowder residue and fingerprints. There was a gun cleaning kit located in defendant's basement, and one neighbor observed all the lights being turned off but a small light moving around defendant's home before the police arrived. Once on scene and when executing a search warrant the following day, investigators were unable to locate the first shotgun shell that had been fired or the wadding from either shot. Under these circumstances, there is a valid line of reasoning and permissible inferences from which a rational jury could conclude beyond a reasonable doubt that defendant tampered with physical evidence by cleaning the shotgun and by hiding or disposing of the spent shell casing and any wadding (see People v Cotto, 231 AD3d 1356, 1360 [3d Dept 2024], lv denied 43 NY3d 962 [2025]; People v Sanders, 185 AD3d 1280, 1286 [3d Dept 2020], lv denied 35 NY3d 1115 [2020]).
Turning to the weight of the evidence, a different verdict may not have been unreasonable as to defendant's mens rea had the jury credited defendant's testimony that he did not mean to fire the second shot and that the shotgun accidentally discharged when he tripped on the deck. However, the People presented evidence calling that narrative into question and the competing narratives presented the jury with a credibility determination to resolve. When viewing the evidence in a neutral light and "weighing the relative probative force of the conflicting testimony and evidence, as well as the relative strength of the conflicting inferences to be drawn therefrom," we find that the jury was justified in rejecting defendant's version of the events (People v Sanchez, 32 NY3d 1021, 1022 [2018] [internal quotation marks and citation omitted]). Indeed, defendant's testimony contained numerous inconsistencies and admissions that he lied several times to the 911 dispatcher and the police about being "sound asleep" during the incident, serving as a basis for the jury to reject his other conflicting testimony relating to his supposed trip into the deck railing, the angle of the gun when it fired, that he saw the slug hit the ground and observed no signs of damage or distress from the nearby vehicle thereafter (see People [*8]v Prusinski, 242 AD3d 1427, 1431 [3d Dept 2025], lv denied 45 NY3d 938 [2026]; People v Timmons, 78 AD3d 1241, 1243 [3d Dept 2010], lv denied 16 NY3d 837 [2011]; see also People v Jackson, 65 NY2d 265, 272 n 7 [1985]). Despite his testimony that none of the occupants left their vehicles, displayed a weapon or otherwise called out to him, the gravamen of defendant's testimony remained focused on his belief that he was under "siege" and that there were five people in each vehicle taking part in an "invasion." This testimony, coupled with the jury's finding that he deliberately fired the shotgun at vehicles he believed to be occupied with at least 10 people, demonstrates an utter disregard for human life and reckless conduct creating a grave risk of death (see People v Serrano, 173 AD3d 1484, 1486 [3d Dept 2019], lv denied 34 NY3d 937 [2019]; see also People v Dorvil, 234 AD3d at 1111-1112). When deferring to the jury's credibility determination that defendant deliberately fired the second shot, his testimony relating to gun safety further demonstrated that he was aware of and consciously disregarded a substantial and unjustifiable grave risk of death by firing in the direction of occupied vehicles, demonstrating a lack of care about any grievous harm that might result (see People v Durham, 146 AD3d 1070, 1074 [3d Dept 2017], lv denied 29 NY3d 1078 [2017]; see also People v Maeweather, 172 AD3d at 1648-1649). Accordingly, we are satisfied that the weight of the evidence supports defendant's convictions for murder in the second degree and reckless endangerment in the first degree.
As for the tampering charge, a different verdict also would not have been unreasonable had the jury credited defendant's theory that law enforcement overlooked the missing shotgun shell and wadding in their search surrounding defendant's house, or the forensic testimony that not all tested surfaces retained fingerprints. However, conflicting inferences could be drawn from the evidence introduced by the People and, when deferring to the jury's factual determinations and credibility assessments, we conclude that the weight of the evidence also supports defendant's conviction for tampering with physical evidence (see People v Cotto, 231 AD3d at 1360; People v Franklin, 216 AD3d 1304, 1312 [3d Dept 2023], lv denied 40 NY3d 934 [2023]). To the extent that defendant also challenges this count of the indictment as duplicitous, such objection was waived by his failure to move to dismiss on this ground prior to trial (see People v Wright, 22 AD3d 873, 875 [3d Dept 2005], lv denied 6 NY3d 761 [2005]; see also CPL 200.70, 200.95 [8]; 210.20, 255.20).
Next, defendant contends that County Court's refusal to meaningfully sanction the People for multiple Rosario and discovery violations deprived him of a fair trial. Specifically, defendant argues that the People's failure to timely disclose the wife's recorded statements to police and a state trooper's training certificates warranted reversal [*9]of his convictions. When discoverable material "is disclosed belatedly, the court shall impose a remedy or sanction that is appropriate and proportionate to the prejudice suffered by the party entitled to disclosure" (CPL 245.80 [1] [a]; see People v Jordan, 232 AD3d 1135, 1136-1137 [3d Dept 2024], lv denied 43 NY3d 945 [2025]). Here, the People concede the failure to turn over the wife's recorded statements, but contend, without contradiction, that the recording was consistent with a written statement produced following the interview — which was turned over to defendant during discovery. As a remedy, County Court permitted defendant to recall the wife, which we conclude to be an appropriate exercise of discretion under these circumstances (see People v Jordan, 232 AD3d at 1137). Relating to the state trooper's training certificates, defendant's entitlement to such certificates was dependent on the trooper's testimony being considered an expert opinion (see CPL 245.20 [1] [f]). County Court determined the trooper's testimony was not an expert opinion, and defendant's failure to challenge this determination on appeal renders it abandoned (see People v White, 239 AD3d 1037, 1038 n [3d Dept 2025], lv denied 44 NY3d 985 [2025]).
Defendant also contends that County Court committed reversible error when it denied his motion for a mistrial after the People played bodycam footage for the jury which depicted defendant telling police officers that he had contacted one of his defense attorneys. We disagree. Although it is true that "proof of a defendant's invocation of his or her right to counsel may create a prejudicial inference of consciousness of guilt and has no place in the People's case-in-chief" (People v Lentini, 163 AD3d 1052, 1054 [3d Dept 2018] [internal quotation marks, brackets and citation omitted]), "the People's improper elicitation of the prejudicial evidence does not automatically result in a reversal of the judgment of conviction, even in the absence of a curative instruction or in the face of a deficient curative instruction" (People v Serrano, 200 AD3d 1340, 1346 [3d Dept 2021], affd 38 NY3d 1180 [2022]; see People v Peguero-Sanchez, 29 NY3d 965, 967 [2017]). "Rather, any such constitutional error is subject to a harmless error analysis, which requires this Court to consider whether there was overwhelming proof of the defendant's guilt and whether there was any reasonable possibility that the People's error may have contributed to the defendant's conviction" (People v Serrano, 200 AD3d at 1346 [citations omitted]; see People v Johnson, 150 AD3d 1390, 1396 [3d Dept 2017], lv denied 29 NY3d 1128 [2017]).
Here, the portion of the bodycam footage played for the jury contained a single statement naming defense counsel. Although it was error for the jury to hear defense counsel's name on the bodycam footage insofar as the parties stipulated to preclude such evidence, the statement did not concern the invocation of counsel and, even if it could [*10]be construed in that manner, the proof of defendant's guilt was overwhelming and we are convinced that there was no reasonable possibility that this single reference resulted in prejudice contributing to defendant's convictions (see People v Serrano, 200 AD3d at 1346-1347; People v Flower, 173 AD3d 1449, 1456 [3d Dept 2019], lv denied 34 NY3d 931 [2019]). The reference was inadvertent and brief, and it occurred after counsel for both the prosecution and defense reviewed the portion of the footage played for the jury to ensure that it complied with a prior ruling — suggesting that such reference was also missed by the defense. County Court issued an appropriate curative instruction, which jurors are presumed to have followed, and our review of the record fails to reveal any attempt by the People to use or exploit this issue (see People v Hajratalli, 200 AD3d 1332, 1338 [3d Dept 2021], lv denied 38 NY3d 1033 [2022]; see also People v Serrano, 200 AD3d at 1347). Accordingly, under these circumstances, we conclude that any such error was harmless beyond a reasonable doubt (see People v Serrano, 200 AD3d at 1347; People v Flower, 173 AD3d at 1456; see also People v Garcia, 203 AD3d 1228, 1230 [3d Dept 2022], lv denied 38 NY3d 1032 [2022]; cf. People v Lentini, 163 AD3d at 1054).
We are unpersuaded by defendant's contention that the prosecutor's conduct during summation deprived him of a fair trial. "Summation affords counsel the right and opportunity to comment on what logical and reasonable inferences may be drawn from such evidence, and what inferences would be improbable" (People v Graham, 215 AD3d 998, 1007 [3d Dept 2023] [citation omitted], lv denied 40 NY3d 928 [2023]). To this point, "attorneys are afforded wide latitude during summations and reversal is warranted only when a prosecutor's remarks are so egregious that they deprive a defendant of a fair trial" (People v Birch, 228 AD3d 991, 992 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 42 NY3d 969 [2024]). The determination of whether reversal based on prosecutorial misconduct during summation is warranted "hinges upon the severity and frequency of the conduct, whether the trial court took appropriate action to dilute the effect of the conduct and whether, from a review of the evidence, it can be said that the result would have been the same absent such conduct" (People v Gertz, 204 AD3d 1166, 1171 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1070 [2022]).
Here, the prosecutor's comments relating to the credibility of the People's witnesses or that the defense attempted to shift blame onto the friends were fair responses to defendant's summation, during which defendant accused several of them of "chang[ing their] testimony to fit the [p]rosecution['s] narrative" (see People v Birch, 228 AD3d at 993; People v Graham, 215 AD3d at 1008). Similarly, the prosecutor's statement about defendant's credibility was a fair comment based [*11]on the evidence — particularly given that defendant admitted to not telling the truth within the same context as was referenced by the prosecutor (see People v Mastowski, 155 AD3d 1624, 1625 [4th Dept 2017], lv denied 30 NY3d 1117 [2018]; see also People v Johnson, 183 AD3d 77, 90 [3d Dept 2020], lv denied 35 NY3d 993 [2020]). The prosecutor's statements about the applicable law for one of the charges were proper, as such statements were used only to illustrate to the jury how the evidence could apply to the respective elements (see People v Pitt, 170 AD3d 1282, 1285 [3d Dept 2019], lv denied 33 NY3d 1072 [2019]; see also People v Gertz, 204 AD3d at 1171). Lastly, the prosecutor's misstatement about the wife's DNA being on the shotgun was improper, but it was not so prejudicial as to deprive defendant of a fair trial — especially considering that the prosecutor immediately withdrew it (see People v Graham, 233 AD3d 1361, 1368 [3d Dept 2024], lv denied 43 NY3d 944 [2025]). Based on the overall record, we conclude that the prosecutor's remarks were not so egregious and pervasive as to deprive defendant of his right to a fair trial (see People v Birch, 228 AD3d at 994; People v Graham, 215 AD3d at 1008).
Defendant also contends that he was deprived of a fair trial due to County Court's failure to properly charge the jury. Specifically, County Court agreed to charge the jury with manslaughter in the second degree (see Penal Law § 125.15 [1]), but, determining that there was no possible view of the evidence under which the jury could conclude that defendant failed to perceive the risk of the shotgun discharging — even accidently — and causing the death of another, denied defendant's request to charge the jury with criminally negligent homicide (see Penal Law § 125.10). We find that defendant's challenge to the court's refusal to charge criminally negligent homicide as a lesser included offense of depraved indifference murder (see Penal Law § 125.25 [2]) "is foreclosed by the jury's verdict of guilty of murder in the second degree . . . and its implicit rejection of the charged lesser included offense of manslaughter in the second degree" (People v Scott, 203 AD2d 911, 912 [4th Dept 1994] [involving contention that the victim was accidently shot during a struggle with the defendant over a shotgun], lv denied 83 NY2d 971 [1994]; see People v Mannix, 302 AD2d 297, 298 [1st Dept 2003] [involving depraved indifference murder and claim of accidental discharge of pistol], lv denied 100 NY2d 622 [2003]). In these circumstances, any such error was harmless beyond a reasonable doubt (see People v McIntosh, 33 NY3d 1064, 1065 [2019]).
Lastly, we reject defendant's contention that his sentence is unduly harsh and severe. Defendant's conviction for depraved indifference murder, a class A-1 felony, required the imposition of an indeterminate prison term with a minimum between 15 and 25 years and a maximum of life (see Penal Law §§ 60.05 [2]; 70.00 [2] [a], [3] [a][*12][i]; 125.25 [2]). Combined with the consecutive sentence for his tampering with physical evidence conviction, defendant's total term of incarceration is 26⅓ years to life. The record reveals that County Court heard and considered certain mitigating factors, including that defendant was 66 years old at the time of sentencing, lacked a criminal history, had been married for 35 years and was the owner of a business. Nonetheless, County Court also considered the seriousness of the instant offense and that defendant expressed limited remorse during the trial for his role in the victim's death — instead justifying his actions upon a narrative unsupported by the record. Upon our review of the relevant factors, including defendant's senseless and unprovoked actions and the devastation caused to the victim's family, as well as defendant's failure to accept responsibility for his violent conduct, we find the imposed sentence was not unduly harsh or severe, and decline to reduce it in the interest of justice (see People v Dorvil, 234 AD3d at 1117; People v Stahli, 159 AD3d 1055, 1060 [3d Dept 2018], lv denied 31 NY3d 1088 [2018]; see also People v Guzy, 167 AD3d 1230, 1238 [3d Dept 2018], lv denied 33 NY3d 948 [2019]). Defendant's remaining contentions have been examined and determined to lack merit.
Garry, P.J., Clark, Mackey and Ryba, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1
The parties stipulated to this fact, and the spouse did not testify at trial.